UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 99-CR-00804-CMA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

EUGENIO MONTOYA SANCHEZ,

        Defendant.
_____/

**OPPOSED MOTION FOR COMPASSIONATE RELEASE, EXHAUSTION OF ADMINISTRATIVE RELIEF, AND REQUEST FOR HEARING**

Eugenio Montoya, through undersigned counsel, respectfully moves this Court to grant his motion for compassionate release under 18 U.S.C § 3582(c)(1)(A), and reduce his 30-year sentence to "time served" or a lesser sentence and in support states:

**A. Procedural background**

The Defendant has served approximately 190 months in jail, equating to 53% of his 360-month sentence.

Montoya was arrested in Colombia in January 2007, extradited to the United States in 2008, and pled guilty in 2009 to Counts 1 and 10 of a 12-count Fifth Superseding Indictment. The Defendant was considered a high-ranking member of his brother Diego Montoya's drug organization, managed his brother drug proceeds. and coordinated a few exports of cocaine from 2003 to 2006. PSI p. 17 ¶ 19. According to the PSI, other high-ranking members included the Defendant's other brother, Juan Carlos Montoya Sanchez, and Carlos Felipe Toro Sanchez. PSI, p. 6, ¶ 7. The sentences of the conspirators are detailed below.

The worst part of the Defendant's criminal participation included an admitted role in violence, including the torture and murder of a confidential informant, as instructed by Diego Montoya. PSI, p. 11 ¶ 26.

The PSI also reports that while jailed at the FDC Miami, the Defendant suffered from depression, in part, from the thoughts of his past criminal participation including the described act of violence. PSI, p. 19, ¶ 66.

The Defendant entered a cooperation style plea agreement that provided for a recommended term of imprisonment of 360 months, with an opportunity to receive Rule 35 relief. The Defendant was sentenced to a 30-year term of imprisonment on April 28, 2009.

For an extended period of time the government represented to defense counsel its intention to move the Court for a reduction of his sentence. However, as described in a related sealed pleading, filed under separate cover, the government withdrew its agreement to seek a lowered sentence. Given that review of Section 3553 factors is necessary to resolve this motion, that "personal background" is addressed in the related sealed pleading.

The Defendant will be deported at the termination of his sentence and intends to spend his future freedom far different from his criminal past. He is repentant, contrite, and very regretful for his participation in the Colombian drug world  His future is focused on making amends to his family for functionally abandoning them and complicating their lives with his serious criminal conduct. His dream is to return to his home nation, reunite with his family, and live in peace as a farmer.

### B. Incarcerative history.

After he arrived in the United States in June 2008, the Defendant and was jailed at the FDC Miami for 14 months until he was transferred to another facility in August 2009. For an extraordinarily lengthy period of time, the Defendant was placed in the Z Unit, commonly referred to as the solitary confinement unit (SHU) at the facility. During that time period, the Defendant rarely had the opportunity for a social visit, a telephone call, and never had the chance to visit with his wife or children. Your Honor heard and considered prison condition motions filed by codefendants. *See* Notice of Filing Relevant Documents Pertinent to Solitary Confinement Status by Carlos Felipe Toro Sanchez, DE 196, 9/27/05, and Motion to Review Conditions of Pre-Trial Incarceration by Juan Carlos Montoya Sanchez DE 179, 7/11/20. The Defendant suffered similar conditions.

The Defendant returned to the FDC Miami on writ in December 2009 until May 2010, during which he was kept in SHU for five more months.

In May 2010, the Defendant arrived at the FCI Beaumont and was placed in SHU for four months until September 2010 and then placed in General Population until he was transferred again to Miami, on a *writ of habeas corpus ad testificandum* in March 2011.

In March 2011, the Defendant was placed in general population for a relatively short period of time and was then sent to Z Unit, SHU, in April 2011 pending investigation for possession of a cell phone. The Defendant was again placed in the solitary housing unit at the FDC from April 2011 through December 2011.

The Defendant's presence at the FDC Miami in April 2011 was to ensure that he was available as a putative and prospective witness against Oscar Varela Garcia aka "Capachivo" whose trial was scheduled to commence before Your Honor in April 2011

but began in May and lasted until May 27, 2011. Coconspirator Varela Garcia was sentenced on October 20, 2011 to 280 months in prison.

Notwithstanding the Defendant's extradition, cooperation, and sentence, the government never issued a visa that would allow his Colombian wife or children to visit with him at any time at any jail over the past 11 years.

While at FCI Beaumont in August 2017, the Defendant experienced Hurricane Harvey, one of the most devastating hurricanes in Texas history. The Defendant, like others at that prison, spent weeks without running water and electricity. The extraordinary high temperatures and humidity were unbearable. Basic necessities were scarce or non-existent. See, *After Harvey, Texas Inmates Were Left in Flooded Prisons Without Adequate Water or Food,* John Washington. The Nation. October 13, 2017. (https://www.thenation.com/article/archive/after-harvey-texas-inmates-were-left-in-flooded-prisons-without-adequate-water-or-food/)

Most recently, in August 2020, during Hurricane Laura, the Defendant's unit was evacuated to another building after the roof of his unit began to come off.

Amidst the pandemic at FCI Oakdale, the Defendant suffered hunger and thirst with no water and electricity in the aftermath of Hurricane Laura.

The Defendant contracted COVID-19 at Oakdale FCI around April 2020, as further described below. He is a COVID "long hauler," someone who continues to suffer adverse symptoms long after the "cure."

The Defendant has experienced horrific conditions while imprisoned. He has been surrounded by death during the pandemic and disastrous conditions and evacuations during multiple hurricanes.

Watching and learning of the passing of fellow Oakdale inmates has been psychologically devastating.

The Defendant has not seen his family in 15 years and, during these traumatizing events, during this pandemic, his mind races and questions whether he will ever see his wife and children again.  We, as a society, extol the ideal and virtues of family.  But as a Nation, we extradite and refuse to admit the wife or children of someone we take to this country and effectively prevent a visit, a touch, a hug, or a word, in person, for decades.

On April 29, 2020, Mr. Montoya filed an administrative remedy with the FCI Oakdale Warden requesting compassionate release in light of his medical condition and related matters.  The Warden denied the request on May 27, 2020.  *Id.* at 2.  The inmate filed a new substantive application on December 1, 2020.  See Exhibit A.  This application follows 30 days thereafter, without a substantive response.

### C. Based on extraordinary and compelling reasons presented, this Court has the authority to resentence Mr. Montoya under 18 U.S.C. § 3582(c)(1)(A).

With the changes made to the compassionate release statute by the First Step Act, courts need not, any longer, exclusively await a motion from the Director of BOP to resentence prisoners to time served or a lower sentence under 18 U.S.C. § 3582(c)(1)(A) for "extraordinary and compelling reasons."  Reasons that can justify resentencing include—but are not limited to—medical, family, or age-related circumstances.

The First Step Act has been newly interpreted to no longer include "guideline categories" that were formerly applied to BOP early release consideration, as distinguished from judicial considerations.

A line of new and better reasoned cases all hold this Court is allowed to make the compassionate release determination independent of the Sentencing Commission's criteria. *See United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020), *United States v. Jones*, 980 F.3d 1098 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, 980 F.3d 1178 (7th Cir. Nov. 20, 2020); and *United States v. McCoy*, -- F.3d --, 2020 WL 7050097 (4th Cir. Dec. 2, 2020))). *See United States v. Clausen*, 2020 WL 4260795, *5 (E.D. Pa. July 24, 2020) (collecting cases).

The Second Circuit in *Brooker* explained why:

> And so we turn to the question at the heart of this case: whether the First Step Act allows courts independently to determine what reasons, for purposes of compassionate release, are "extraordinary and compelling," or whether that power remains exclusively with the BOP Director as stated in Application Note 1(D). . . .
>
>             * * *
>
> As with most cases of statutory interpretation, we begin with the text. . . . 18 U.S.C.
> [section] 3582(c)(1)(A)(i), after being amended by the First Step Act, currently reads in relevant part:
>
>> the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant . . . , may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, *if [the court] finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .*
>
> . . . [T]he major difference between this statute and its prior incarnations is that an imprisoned person moving for compassionate release can now bring a claim before the courts even if the BOP opposes the claim. . . .

6

Significantly, the statute's text, while it requires courts when adjudicating compassionate release motions to consider the Guidelines, requires such courts to consider only "applicable" guidelines. 18 U.S.C. § 3582(c)(1)(A). It follows that the question before us is whether Guideline [section] 1B1.13, and specifically Application Note 1(D), remains "applicable" after the changes made in the First Step Act.

Turning to the text of Guideline [section] 1B1.13, it is manifest that its language is clearly outdated and cannot be fully applicable. The very first words of the Guideline are "[u]pon motion of the Director of the Bureau of Prisons." U.S.S.G.
§ 1B1.13. And this is precisely the requirement that the First Step Act expressly removed. *See* 18 U.S.C. § 3582(c)(1)(A). We could, therefore, read the Guideline as in effect abolished. And that would settle the case before us, absent an unlikely severability of the Application Note. But we prefer to save as much of the Guideline language and policy as possible. . . . As a result, . . . we read the Guideline as surviving, but now applying only to those motions that the BOP has made.

In doing so, we look also to Application Note 4, which says that "[a] reduction *under this policy statement* may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. [section] 3582(c)(1)(A)." U.S.S.G. § 1B1.13, n.4 . . . . And we conclude that after the First Step Act, this language must be read not as a description of the former statute's requirements, but as defining the motions to which the policy statement applies. A sentence reduction brought about not "upon motion by the Director of the Bureau of Prisons" is not a reduction "under this policy statement." In other words, if a compassionate release motion is not brought by the BOP Director, Guideline [section] 1B1.13 does not, by its own terms, apply to it. Because Guideline [section] 1B1.13 is not "applicable" to compassionate release motions brought by defendants, Application Note 1(D) cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling.

This reading not only saves as much of the existing Guideline as is possible, given the First Step Act, but it also aligns with Congress' intent in passing that Act. After watching decades of the BOP Director's failure to bring any significant number of compassionate release motions before the courts, Congress allowed people seeking compassionate release to avoid BOP if BOP rejects their motions or fails to act on them within a short time period, only 30 days. *See* 18 U.S.C. § 3582(c)(1)(A) . . .
. When the BOP fails to act, Congress made the courts the decision maker as to compassionate release.

*Brooker*, 976 F. 3d at 234–36.  See also, *United States v. Luis Cano*, Case No. 95-CR-00481, SDFL, DE 965, p. 6.

Because Mr. Montoya properly pursued his administrative remedies and filed a motion for compassionate release, this Court possesses authority to reduce his sentence if it finds that "extraordinary and compelling reasons warrant such a reduction."  This Court must consider the 18 U.S.C. § 3553(a) sentencing factors in reducing any sentence, and any reduction of sentence that a court orders must also be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

This Court has jurisdiction to reduce the sentence to a lower term of years or with conditions.

As noted above, in U.S.S.G. § 1B1.13, the Sentencing Commission created a provision allowing compassionate release based on the defendant's medical condition, age, family circumstances, or "other reasons."  This Court knows the BOP rarely used its authority which the Commission improvidently adopted.  However, perhaps relevant here by some degree of suggestion, application note 1(A) to § 1B1.13 states that the "Medical Condition of the Defendant" may constitute extraordinary and compelling reasons warranting the reduction where "[t]he defendant is suffering from a terminal illness (i.e. a serious and advanced illness with an end of life trajectory)." U.S.S.G. § 1B1.13, comment 1(A)(i).  The note makes clear, however that: "[a] specific prognosis of life expectancy (i.e. a probability of death within a specific time period) is not required."

Subsection A(ii) of that same note states that extraordinary and compelling reasons may be found where the defendant is "suffering from a serious physical or medical condition, ... or experiencing deteriorating physical or mental health because of

8

the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, comment 1A(ii).

And in application note 1(D), the Commission created a catch-all provision allowing compassionate release for a combination of reasons including the defendant's medical condition, age, or family circumstances.

However, the dependence on former BOP guidance, through rarely implemented BOP Policy Statements, incorporated within the USSG, is a relic inconsistent with the First Step Act's amendment of § 3582(c)(1)(A). Section 1B1.13 no longer limits judicial authority.

The First Step Act allows this Honorable Court to consider and grant sentence reductions even in the face of an adverse or unresolved BOP determination concerning whether a prisoner's case is extraordinary or compelling. See § 3582(c)(1)(A)), as amended by Pub. L. 115-391, § 603 (Dec. 21, 2018).

With the First Step Act, Congress decided that federal judges are no longer constrained or controlled by how the BOP Director set the criteria for what constitutes extraordinary and compelling reasons for a sentence reduction.

### A. **The Defendant suffers from a pre-existing long diagnosed complicating medical condition, also contracted COVID-19, and still suffers serious remnant effects, placing his continued health in substantial jeopardy such that he respectfully invites this Court to consider his Compassionate Release or sentence reduction.**

Months ago, while Oakdale FCI was suffering the crush of the pandemic, and the institution roiled with controversy regarding the manner in which the virus was ignored rather than confronted, the inmate contracted the COVID-19 virus.

Courts in this district have held that if an inmate has a chronic medical condition that has been identified by the CDC as elevating an inmate's risk of becoming seriously ill from COVID-19, that condition may constitute "extraordinary and compelling reasons" for release.[1]

---

[1] See, e.g., *United States v. Curington*, 12-20115-CR, 2020 WL 4344083 (S.D. Fla. July 7, 2020); *United States v. Moody*, 05-80121-CR, 2020 WL 4059766 (S.D. Fla. June 16, 2020); *United States, v. Potts*, 06-80070-CR, 2020 WL 5540126 (S.D. Fla. Sept. 14, 2020); *United States v. McGhee*, 12-60027- CR, 2020 WL 3884567 (S.D. Fla. May 18, 2020); *United States v. Platten*, 08-80148, 2020 WL 4333525 (S.D. Fla. Apr. 17, 2020); *United States v. Sanchez*, 95-00421-CR, 2020 WL 3581631 (S.D. Fla. Apr. 27, 2020); *United States v. Chopra*, 18-CR-20668, 2020 WL 4333507 (S.D. Fla. July 24, 2020); *United States v. Blake*, 15-CR-80018, 2020 WL 4677309 (S.D. Fla. Aug. 12, 2020); *United States v. Feucht*, 11-CR60025, 2020 WL 2781600 (S.D. Fla. May 28, 2020); *United States v. Lima*, 16-20088-CR, 2020 WL 4343836 (S.D. Fla. May 11, 2020); *United States v. Minsa*l, 1:18-CR-20597-UU, 2020 WL 4516360 (S.D. Fla. Aug. 5, 2020); *United States v. Minor*, 18-CR-80152, 2020 WL 4333524 (S.D. Fla. Apr. 17, 2020); *United States v. Schumack*, 14-80081-CR, 2020 WL 4333526 (S.D. Fla. June 11, 2020); *United States v. Gomez*, CR 11-20698, 2020 WL 5518358 (S.D. Fla. Sept. 14, 2020); *United States v. Israel*, 95-00314-CR, 2020 WL 4362258 (S.D. Fla. July 29, 2020); *United States v. Huarte*, CR 11-20587, 2020 WL 4429424 (S.D. Fla. July 31, 2020); *United States v. Laing*, 18-20731-CR, 2020 WL 5032977 (S.D. Fla. Aug. 24, 2020); *United States v. Vazquez Torres*, 19-CR-20342, 2020 WL 4019038 (S.D. Fla. July 14, 2020); *United States v. Bailynson*, CV 18-CR-80124, 2020 WL 5367320 (S.D. Fla. Sept. 8, 2020); *United States v. Reynolds*, 14-CR-80227, 2020 WL 4333504 (S.D. Fla. July 8, 2020); *United States v. Barbuto*, 18-CR80122, 2020 WL 4333505 (S.D. Fla. Apr. 28, 2020); *United States v. Brown*, 14-CR-60161, 2020 WL 5116781 (S.D. Fla. Aug. 31, 2020); *United States v. Weems*, 18-CR-60185-BB, 2020 WL 4558381 (S.D. Fla. Aug. 7, 2020); *United States v. Lewis*, 10-CR-60292, 2020 WL 4333489 (S.D. Fla. July 20, 2020); *United States v. Siegert*, 13-80009-CR, 2020 WL 4726929 (S.D. Fla. Aug. 13, 2020); *United States v. Oreste*, 14-20349-CR, 2020 WL 4343774 (S.D. Fla. Apr. 6, 2020); *United States v. Rice*, 90-CR-00768, 2020 WL 4333527 (S.D. Fla. June 8, 2020); *United States v. Arenales-Monroy*, 16-CR-20374-KMW, 2020 WL 4344085 (S.D. Fla. June 18, 2020); *United States v. Firebaugh*, 1:16-CR-20341-UU, 2020 WL 4343835 (S.D. Fla. June 25, 2020); *United States v. Woodson*, 13-20180-CR, 2020 WL 4333488 (S.D. Fla. June 4, 2020); *United States v. Pimental,* 19-CR-20104, 2020 WL 5500840 (S.D. Fla. Sept. 11, 2020); *United States v. Welch*, 09-60212-CR, 2020 WL 4333667 (S.D. Fla. May 21, 2020); *United States v. Woolley*, 9:19-CR-80093, 2020 WL 4904210 (S.D. Fla. Aug. 20, 2020); *United States v. Jaen*, 91-00814- CR, 2020 WL 4209283 (S.D. Fla. July 6, 2020).

The inmate's past medical history reflects a diagnosis of hypertension, described by the CDC as a complicating comorbidity. Throughout his jail term, the inmate has been and is now dispensed daily medication. In addition, the inmate suffers from high cholesterol.

The inmate experienced severe and debilitating effects from COVID-19 in April of 2020, at Oakdale. To say that he received inadequate treatment would be a drastic understatement. He was untreated. The Defendant was tested for COVID by the BOP only after suffering many weeks from the worst effects of that disease.

The inmate tested negative after he spent 20 days in quarantine and was forced to treat himself, with only the benefit of acetaminophen.

Montoya suffered prolonged and extreme body and head pain for an extended period of time. His symptoms included days of high fever, body pain, hallucinations, all as part of his COVID symptoms. Presently, the inmate continues to suffer from the continuing and painful and debilitating long lingering side effects of the COVID virus. Those lingering side effects include, to this day, extreme migraines, ear pain, tinnitus, and hearing loss, along with continuing pain in his joints and severe body aches.

Recent reports reflect that an individual can contract COVID more than once. *Can You Get Covid Twice? What Reinfection Cases Really Mean*. Suzi Ring and Johnson Gale. The Washington Post. October 29, 2020. (https://www.washingtonpost.com/business/can-you-get-covid-twice-what-reinfection-cases-really-mean/2020/10/28/1cd3b53a-18d9-11eb-8bda-814ca56e138b_story.html). In prison, with his pre-existing conditions, the Defendant remains susceptible to a more severe result than before.

Continuing to this month, the Defendant is suffering from dizzy spells, incessant headaches, extreme nausea and vomiting. After filing complaints for various months, the Defendant was given an EKG and bloodwork was done sometime in October but as of yet, he has not received the results. He was solely prescribed Ibuprofen.

1. **The conditions at FCI Oakdale have been so bad, and remain terrible, such that the Warden was fired and many have not survived.**

In May of 2020, a month or so after the Defendant contracted the virus, Warden Rod Myers was removed by the Bureau of Prisons as the Warden of the Federal Correctional Institution in Oakdale. The Oakdale FCI union representative, Morris, was quoted as saying that 40 staff members had tested positive for COVID-19, along with 227 inmates. Morris described that a few inmates were then hospitalized, 120 more were in isolation and an additional 821 were being quarantined. This inmate was one of those described by Morris. Other inmates have died after contracting COVID-19 at Oakdale FCI around the same time period. Many others have passed since April 2020. *1 federal prison, 8 deaths: Report details COVID-19's early march through the system*, Kevin Johnson, USA Today, November 17, 2020. (https://www.usatoday.com/story/news/politics/2020/11/17/justice-dept-finds-covid-failings-louisiana-prison-where-8-died/6324153002/) Last accessed November 23, 2020

Union Representative Morris sent a letter to Michael Carvajal, assistant director of the Bureau of Prisons Correctional Programs Division. In the letter, Morris spoke out about alleged negligence at Oakdale FCI, resulting in staff and inmate endangerment during the COVID-19 pandemic.

Long before his was jailed for his crimes, the inmate previously suffered an array of medical issues resulting from a severe car accident in 1987 that required 16 surgeries and three years of recuperation. The head trauma is still visibly noticeable by viewing his skull. He head is indented his left shoulder never recovered. The inmate has little to no function of his left arm and is only able to move it with the assistance of his right arm. *See* PSI pp. 17-18, § 62-65.

### D. **Unrewarded cooperation**.

The Defendant's Sealed Supplement to Motion for Compassionate Release describes additional relevant facts, including, (1) efforts to cooperate throughout the history of his case, (2) the unrequited promise of the government to file for reduction, and, (3) ruminations on the reasons why the government did not file.

Counsel for the Defendant has conferred and continues with efforts to confer with the government, without success, in attempting to obtain Rule 35 relief. The Defendant invites the Court's consideration of these facts as part of the Section 3553 personal background analysis in determining whether to grant this motion.

### E. **Consideration of the § 3553 (a) factors**

Assuming the Court reaches a finding of extraordinary and compelling reasons for a sentence reduction, this Court, to permit compassionate release, must further find that those reasons are not outweighed by consideration of the Section 3553 (a) factors such that a sentence reduction does not undermine the original sentence. See 18 U.S.C. § 3582 (c)(1)(A) (requiring consideration of the applicable § 3553 (a) factors).

The § 3553 (a) factors include, inter alia, the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to

reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes by the defendant; and the need to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553 (a).

The Court originally imposed a 30-year jail sentence for reasons evidenced in the plea agreement, the PSR report, and consistent with the factual proffer. That was a fair sentence for the crimes committed, given that it was reasonable to believe that the government would move for a sentence reduction in the future, as it has done on behalf other related case conspirators.

Subsequently, and given his writ status in returning to the FDC Miami shortly before trial commenced, we believe this Defendant was placed on the Witness List in the case styled *United States v. Oscar Varela Garcia*, Case No. 99-cr-00804-CMA-12. Though sealed, DE 438 appears to be a protective order regarding the Witness List.

Over the years, the following sentences have been imposed on the conspirators, including the Defendant's family members.

| Defendant | Charge | Sentence | Sentence Reduction |
|---|---|---|---|
| Adolfo Lopez-Blanco (1) | | | |
| Jairo Garcia (2) | Count 2, Money Laundering, 18 U.S.C. § 1956 | IMPRISONMENT 92 months, as to Count 2, Money Laundering, 18 U.S.C. § 1956, with credit for time served | |
| Luis Fernando Martinez (3) | | | |
| Diego Montoya Sanchez (4) | CONSPIRACY TO IMPORT COCAINE<br><br>Count 10 Injuring Officer/Juror/Witness | IMPRISONMENT 540 months, with credit for time served<br><br>5 years Supervised Release,<br>Restitution $500,000<br><br>Concurrent w/ Case No. 09-CR-20665-Altonaga | |
| Gustavo Echeverri (5) | Count 2, Money Laundering, 18 U.S.C. § 1956 | IMPRISONMENT 63 months, with credit for time served<br><br>3 years Supervised Release<br><br>$12,500 Fine | |
| Juan Galvez (6) | Count 2, Money Laundering, 18 U.S.C. § 1956 | IMPRISONMENT 63 months, with credit for time served<br><br>3 years Supervised Release<br><br>$12,500 Fine | |
| Juan Carlos Montoya Sanchez (7) | CONSPIRACY TO IMPORT COCAINE | IMPRISONMENT 262 months, with credit for time served since his arrest, | |

15

|  |  | 5 years supervised reléase, $100.00 assessment |  |
| --- | --- | --- | --- |
| Eugenio Montoya Sanchez (8) | CONSPIRACY TO IMPORT COCAINE<br><br>Count 10 Injuring Officer/Juror/Witness | IMPRISONMENT 360 months, with credit for time served<br><br>5 years Supervised Release,<br>Restitution $500,000 |  |
| Carlos Felipe Toro Sanchez (9) | CONSPIRACY TO IMPORT COCIANE | IMPRISONMENT 235 months, with credit for time served since his arrest, 5 years supervised release, $100.00 assessment | Sentence reduced to 110 months January 26, 2012 |
| Carlos Jose Robayo Escobar (10) | CONSPIRACY POSSESS CONTRL SUBSTANCE | Imprisonment for a term of 140 months; 5 years supervised release, $100.00 special assessment. Term to run concurrent with the term imposed in case no. 06-20602-CR-ALTONAGA. |  |
| Omar Garcia Varela (11) |  |  |  |
| Oscar Varela Garcia (12) | CONSPIRACY NARCOTICS IMPORT/EXPORT (1)<br>CONSPIRACY TO POSSESS NARCOTICS (2)<br>MONEY LAUNDERING – INTERSTATE COMMERCE (3)<br>CONSPIRACY TO DEFRAUD THE UNITED STATES (9)<br>INJURING OFFICER/JUROR/ WITNESS (10) | 280 months imprisonment and 5 years supervised release |  |

16

| | RETALIATING AGAINST WITNESS, VICTIM (11-12) | | |
|---|---|---|---|
| Gildardo Rodriguez Herrera (13) | CONSPIRACY NARCOTICS IMPORT/EXPORT (1) | IMPRISONMENT 235 months, 5 years Supervised Release | 105 months |
| Jorge Ivan Urdinola Perea (14) | CONSPIRACY NARCOTICS IMPORT/EXPORT (1) | IMPRISONMENT 218 months, 5 years Supervised Release | |

*See also*, Sealed Exhibit, filed under separate cover.

### F. Mr. Montoya-Sanchez is no longer a danger to this Nation or the Colombian nation.

Mr. Montoya-Sanchez was a drug trafficker as a young man. He has served 190 months' imprisonment, without ever seeing his wife or children. One can say he was dangerous in 2006.

He is no longer the same man who committed those crimes for which he has been jailed over the past decade. *See* 18 U.S.C. § 3582 (c)(1)(A). Mr. Montoya-Sanchez will be deported upon completing his sentence and does not pose a danger to any person or the community, and the government cannot demonstrate otherwise.

### G. Conclusion.

For the foregoing reasons, the Defendant respectfully seeks the entry of an order granting some degree of compassionate release. Should the government reconsider its Rule 35 decision, counsel will promptly advise the Court and the Defendant will withdraw this motion.

Consistent with the Local Rules, the undersigned discussed this motion with AUSA Michael Davis who is still reviewing the case but most likely will oppose relief.

We thank the Court for its review.

Respectfully submitted,

*/s Neil M. Schuster*
Neil M. Schuster, P.A.
Florida Bar No. 216909
555 N.E. 15th St., Ste. 2C
Miami, FL   33132
Telephone: (305) 416-0324
Facsimile: (305) 416-0325
Email: neil@neilmschuster.com

### CERTIFICATE OF CM/ECF SERVICE

I HEREBY CERTIFY that on __**January 6, 2021**_____, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system. However, Exhibit A, a sealed pleading, has been provided to AUSA Davis under separate cover.

By: __*s/ Neil M. Schuster*_____
    Neil M. Schuster