UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case Nos. 99-804-Cr-Altonaga

UNITED STATES OF AMERICA

v.

EUGENIO MONTOYA SANCHEZ
_____/

**<u>GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR COMPASSIONATE RELEASE</u>**

The United States files this response in opposition to DE 817, which is the defendant's motion for compassionate release. The defendant seeks relief under 18 U.S.C. § 3582(c)(1)(A), which requires the defendant to show (1) that "extraordinary and compelling reasons" warrant the requested sentencing reduction; (2) that the balance of applicable factors under 18 U.S.C. § 3553(a) weigh in favor of the reduction; and (3) that the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).

Based upon the defendant's increased susceptibility to COVID-19 due to his obesity, the government is not contesting that the defendant has an "extraordinary and compelling reason" under § 3582(c)(1)(A). Nonetheless, the government respectfully submits that the Court still should deny the defendant's motion, because the defendant has not met his burdens of showing that the § 3553(a) factors weigh in favor of release and that he is not a danger to the community. To the contrary, the § 3553(a) factors weigh decidedly against release, and the record before this Court reflects that the defendant presents a significant danger to others.

# I. BACKGROUND

## A. *Defendant's Offenses of Conviction and Sentence*

The defendant is serving a 360-month sentence following his guilty plea to Counts 1 and 10 of the fifth superseding indictment.

Those counts, respectively, charged the defendant with: (a) conspiring to import cocaine into the United States, in violation of 21 U.S.C. § 963, and (b) obstruction of justice by murder, in violation of 18 U.S.C. §§ 1503(b)(1). The J&C and amended J&C are docket entries 320 and 330, respectively. The amended J&C added an order of restitution of $500,000, *see* DE 330, p. 5, which has been satisfied.

## B. *Defendant's Basic Biographical Information and Custodial Status*

Per page 4 of the PSI, the defendant is 50 years' old. The defendant was arrested in Colombia on January 15, 2007, and was extradited to the United States on June 17, 2008. *See* PSI, p. 2. The defendant is housed at Oakdale I FCI. Per the BOP website, the defendant has a scheduled release date of September 17, 2032.

A check of the BOP website on February 3, 2021, at approximately 6:50 p.m. reflects that the institution: (a) houses 886 inmates, *see* https://www.bop.gov/locations/institutions/oak/; and (b) presently has five active COVID-19 cases among the inmate population and 25 active cases among the staff. *See* https://www.bop.gov/coronavirus/. Over the course of the pandemic, seven inmates at the institution have died due to COVID-19, while another 225 inmates and 21 staff members have incurred COVID-19 and recovered. *See id.* The seven inmate fatalities all occurred during the early stages of the pandemic between March 28, 2020, and April 15, 2020. *See* https://www.bop.gov/resources/press_releases.jsp.

      C.     *<u>Defendant's Offense Conduct</u>*

The defendant's offense conduct arose out of his longstanding role as third-in-command of the cocaine trafficking organization led by his brother, Diego Montoya Sanchez. The below summary of the defendant's offense conduct is based upon the defendant's signed factual basis in support of his guilty plea, *see* DE 304, and supplemented by the signed factual basis in support of the guilty plea of his brother, Diego, *see* DEs 335 and 335-2, and testimony from the May 2011 trial of the defendant's co-defendant and co-conspirator, Oscar Varela Garcia.

By way of background, the Montoya organization started as a cocaine production organization in the mid-1980s. *See* DE 304, pp. 3-4. Over the course of the 1990s, the organization rose to become one of the pre-eminent cocaine trafficking organizations in Colombia's North Valle Cartel, smuggling loads that ranged from 500 to 6,000 kilogram of cocaine per load. *See* DE 304, pp. 4-5 & 7-8; DE 335, pp. 6-11.

While large numbers of these loads were successfully smuggled into Mexico and elsewhere, law enforcement intercepted and seized a number of significant loads. Among these seizures were: (a) two seizures in the Spring of 2001 of 6,000 and 12,000 kilograms of cocaine, respectively; (b) a seizure in December 2001 of approximately 9,300 kilograms of cocaine; and (c) a seizure in July 2004 of approximately 2,200 kilograms of cocaine. Part or all of the seized loads belonged to the Montoya organization. The scope of these seizures helps illustrate the magnitude of the organization's smuggling activities. *See* DE 304, p. 8.

Starting in the early 1990s, the defendant assumed primary responsibility for managing Montoya organization drug finances. His role in this regard included maintaining and overseeing stash houses used to store cash drug proceeds on behalf of the Montoya organization. The Montoya organization often maintained between $18 million and $20 million in cash drug proceeds collectively in its different stash houses around Colombia, sometimes storing as much as

between $6 million and $8 million in a single stash house. Cash drug proceeds stored in these stash houses included drug proceeds generated from the activities of the Montoya organization, as well as drug proceeds generated by the activities of other prominent Colombian drug traffickers and held on their behalf. Cash drug proceeds stored in these stash houses generally were in the form of United States currency. *See* DE 304, pp. 5-6, DE 335, pp. 11-12.

The defendant used organization drug proceeds to pay various expenses incurred by the organization. These included: (a) purchasing laboratory chemicals for Montoya organization cocaine laboratories, as well as laboratories operated by other North Valley Cartel traffickers; (b) purchasing cocaine paste to be processed at Montoya organization cocaine laboratories; (c) paying persons who worked in Montoya organization cocaine laboratories; (d) paying persons in Colombia responsible for transporting Montoya organization cocaine within Colombia, including to ports and other locations from which it was smuggled to Mexico and elsewhere; (e) paying persons who provided security and debt collection services to the Montoya organization; and (f) paying bribes to corrupt officials who assisted the Montoya organization. *See* DE 304, pp. 5-6; DE 335, pp. 11-12. Montoya organization debt collection In addition, the defendant used Montoya organization drug proceeds to invest heavily in land and other real estate. *See* DE 304, pp. 5-6.

In 1999, Diego Montoya Sanchez was indicted in the Southern District of Florida, and the charges were made public in 2000. *See* DE 335-2, p. 4. On or about December 29, 2003, Colombian authorities captured Juan Carlos Montoya Sanchez, the brother of the defendant and Diego. *See id.* at 10.

In October 2003, longstanding tensions between the Montoya and Varela organizations exploded into an all-out war, as the organizations battled for supremacy over the North Valley Cartel. *See* DE 304, p. 13; DE 335-2, p. 10. In the wake of Juan Carlos's arrest, the defendant

took over Juan Carlos's role in overseeing the transportation of Montoya organization cocaine to receiving Mexican organizations. The loads ranged from between approximately 2,500 kilograms to 3,200 kilograms per load. *See* DE 304, p. 8; DE 689, pp. 71-76 (transcript of May 2, 2011); DE 690, pp. 49-50 & 139-40 (transcript of May 3, 2011). At the start of the war, the defendant and others met with his brother, Diego, to draw up the list of Varela organization members to target for murder and to put prices on their heads. *See* DE 637, pp. 124-30 (transcript of May 11, 2011). The organization's cocaine trafficking activities took on added importance during the war, as its narcotics earnings were needed to fund its war activities, most significantly to finance the teams of gunmen used to attack Varela forces. *See* DE 304, p. 13; DE 690, pp. 49-50 & 110-17 (transcript of May 3, 2011).

In addition to using violence to counter external threats, the Montoya organization used violence both to discourage members from cooperating with authorities and to kill those it believed had betrayed the organization. Over the course of its existence, the Montoya organization would use violence in order to protect itself against law enforcement investigations and initiatives. At the direction of defendant Diego Montoya Sanchez and other high-ranking organization members, the organization, would use violence in order to extract from individuals information that the Montoya organization believed these individuals may have provided to authorities. Also at the direction of defendant Diego Montoya Sanchez and other high-ranking organization members, the organization would kill individuals believed to be threats to the organization. The organization would use violence and murder to prevent individuals from passing on information to law enforcement, to punish those suspected of doing so, and to instill fear in others to deter them from doing the same. *See* DE 304, p. 11; DE 335-2, p. 4.

The form of violence and interrogation that defendant Eugenio Montoya Sanchez directed be visited upon organization operative Jhon Jairo Garcia Giraldo, a/k/a, "Dos Mil," was a brutal example of this practice at work. *See* DE 304, pp. 9-13; DE 335-2, p. 4.

Garcia Giraldo's role in organization was to obtain and distribute cell phones and pagers for the Montoya organization. In either late July or early August 2003, the defendant directed Oscar Varela Garcia, who oversaw organization enforcers and hitman, to bring long-time organization enforcer and hitman Carlos Robayo Escobar to a meeting at the defendant's home in Cali, Colombia. After Varela Garcia and Robayo arrived, the defendant told Robayo that Garcia Giraldo was an informant for the U.S. government and directed Robayo to torture Garcia Giraldo and find out what he had told the Americans. Robayo understood that he was to kill Garcia Giraldo after torturing him. The defendant similarly understood that, as a result of the operation, Garcia Giraldo likely would be killed. *See* DE 304, pp. 9-13; DE 638, pp. 50-59 (transcript of May 12, 2011).

In early August 2003, Montoya organization operatives lured Garcia Giraldo to a farm in a rural area outside of Cali. After Garcia Giraldo arrived, enforcers ambushed him and tortured him for information. Notwithstanding the continued torture, Garcia Giraldo steadfastly insisted that he had not cooperated with U.S. authorities. Eventually, it was decided that Garcia Giraldo was not going to talk and would have to be killed. Garcia Giraldo was asphyxiated to death. The enforcers dismembered his body and discarded his remains in a nearby river. *See* DE 304, pp. 10-11; DE 638, pp. 60-70 (transcript of May 12, 2011).

The defendant knew that one of the purposes of the Garcia Giraldo murder was too instill fear in others as to the consequences of cooperating with United States law enforcement against Montoya organization members. *See* DE 304, pp. 13-14. Indeed, the defendant used Garcia Giraldo's murder to give a subordinate a not too subtle reminder as to the potential consequences

of cooperating with authorities.  In a "harsh" tone of voice that the subordinate characterized as "[a]lmost like yelling," the defendant snarled, "'We have killed that sonofabitch.  He's a snitch and he was an informant and he was working with the DEA.'"  DE 690, p. 101-02 (transcript of May 3, 2011).  The subordinate understood the defendant's purpose to be to threaten "that you were not going to flip or turn on him because then you would run the same fate."  *Id.* at 103.

After Oscar Varela Garcia convinced Diego Montoya Sanchez that Carlos Robayo Escobar's workers had turned on the organization by cooperating with authorities, the organization likewise murdered three of Robayo's brothers.  *See* DE 638, pp. 19-31 (transcript of May 12, 2011); DE 641, pp. 33-43 (transcript of May 18, 2011).  The defendant also exploited the organization's murders of the Robayo murders to enforce loyalty.  In a "harsh and aggressive" tone of voice, the defendant frequently reminded the subordinate of what the organization had done to Robayo's brothers.  "'Hey, look brother.  We had to kill those sons of bitches snitches who were all dirty dogs.'"  *See* DE 690, p. 104-05 (transcript of May 3, 2011).  The defendant's forewarnings had their desired impact, eliciting "a lot of terror, a lot of fear" from the subordinate.  *See* DE 690, p. 105 (transcript of May 3, 2011).

### D. *Defendant's Misconduct While in Custody*

Part A of this subsection sets misconduct that has resulted in discipline from BOP, while Part B addresses the incident resulting in the seizure from the defendant's cell at FDC Miami of a cell phone smuggled into the institution, which did not result in discipline.  Another instance of the defendant's misconduct while in custody will be addressed in the government's sealed supplement to this response.

#### 1. **Defendant's Misconduct Resulting in Discipline**

BOP has disciplined the defendant for three incidents while in custody.  Underlying records are appended as **Attachment 1** to this response.

Based upon an incident at FDC Miami on May 10, 2011, the defendant was disciplined for: (a) refusing a work/program assignment, (b) giving/accepting money, and (c) possessing a non-hazardous tool. Underlying records reflect that the discipline arose out of an incident in which the defendant, while in a non-contact visitation room in the Special Housing Unit, accepted an unauthorized liquid drink passed to him via a straw tilted through a mouth piece in the glass partition. The defendant received discipline of 30 days loss of commissary privileges, 30 days loss of phone privileges, and 30 days loss of visitation privileges.

Based upon an incident at FCC Beaumont Medium, on May 12, 2012, the defendant was disciplined for unauthorized physical contact. Underlying records reflect that the discipline arose out of an incident in which the defendant touched a female visitor in the crotch. The defendant received discipline of 60 days loss of visitation privileges.

Based upon an incident at FCC Beaumont Low, on December 20, 2014, the defendant was disciplined for destroying or disposing of an item during a search. Underlying records reflect that the discipline arose out of an in which, after a BOP officer noticed an item in the defendant's pocket during a search and directed the defendant to remove and display the item, the defendant instead dumped the item in the toilet and flushed it. The defendant received discipline of 41 days loss good conduct time, 30 days disciplinary segregation (suspended), 180 days loss of commissary privileges, and 180 days loss of e-mail privileges.

### 2. Defendant's Possession at FDC Miami of Smuggled Cell Phone

As the Court may recall from the testimony from Gildardo Rodriguez Herrera at the trial of Oscar Varela Garcia, while at FDC Miami the defendant paid $1,500 for a cell phone that other inmates had smuggled into the institution. The defendant hid the phone in his cell. On April 16, 2011, approximately 2½ weeks before the start of the Varela Garcia trial, the phone was seized from the defendant's cell.

The defendant did not receive any discipline for the incident. As Rodriguez Herrera testified, at the defendant's behest, he (that is, Rodriguez Herrera) falsely took responsibility for incident. DE 641, pp. 85-91 (transcript of May 18, 2011).

### E. *Defendant's Previous Administrative Request for Reduction of His Sentence*

Defense counsel's letter to the Warden requesting compassionate release, which is dated December 1, 2020, is appended to the defendant's motion. *See* DE 817-1. By letter dated January 4, 2021, the Warden denied the request. The Warden's letter is appended as **Attachment 2** to this response. As grounds for denying defense counsel's request, which the Warden's letter acknowledged receiving on December 14, 2020, the letter states in pertinent part:

> According to the Clinical Director, inmate Montoya-Sanchez has not been diagnosed with a terminal, incurable disease with a life expectancy of eighteen months or less. Inmate Montoya-Sanchez does not suffer from a chronic or serious medical condition related to the aging process and the Bureau of Prisons (BOP) can provide conventional treatment to manage his medical needs.

*Id.*

## II. BOP'S RESPONSE TO THE COVID-19 PANDEMIC

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. *See* BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Nine of the Action Plan, as updated by a notice posted on the BOP website on November 25, 2020. They are appended as **Attachment 3** to this response. The information in **Attachment 3** sets out various operational plans to maximize social distancing and limit the risk transmission. BOP's operation plans address subjects that include procedures for intake and screening; and procedures and limitations on social visitation, legal visitation, volunteer visitation, contractor access, staff training, staff travel, and tours.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).

Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).

On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of

coronavirus transmission.  *See Memorandum from Attorney General to Director of Bureau of Prisons* (appended as **Attachment 4** to this response).   A check of the BOP website on February 3, 2021, at approximately 6:50 p.m., reflects that BOP has 7,778 inmates on home confinement and that the total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 21,238.  *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, at https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution.  BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead.  But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations.  For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public.  It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible.  It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times.  And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

### III. ANALYSIS

#### A. *18 U.S.C. § 3582(c)(1)(A)*

Section 3582(c)(1)(A) of Title 18 of the United States Code states in pertinent part:

> The court may reduce the term of imprisonment if it finds that "extraordinary and compelling reasons warrant such a reduction" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.* [*i.e.*, 18 U.S.C. § 3582(c)(1)(A)]. In making the decision whether to reduce the term of imprisonment, the court must also consider the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable. *Id.*

*United States v. Chavez*, 2020 WL 2322917, *1 (S.D. Fla. May 11, 2020).[1] The "applicable policy statemen[t] issued by the Sentencing Commission" is U.S.S.G. § 1B1.13, which sets out the type of medical situations that may qualify as "extraordinary and compelling reasons" warranting release and also requires the Court to find that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13.

Application note 1A to U.S.S.G. § 1B1.13 outlines two types of medical-related situations that can provide "extraordinary and compelling reasons." Under the first, set forth in note 1A(i),

> The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

U.S.S.G. § 1B1.13 application note 1(A)(i).

Under the second, set forth in note 1A(ii),

---

[1] The statute also contains an administrative exhaustion requirement which, in pertinent part, requires that 30 days have lapsed following the Warden's receipt of the defendant's administrative request for compassionate release. Because, as set forth in Section 1.E. of this response, the Warden received the defendant's request more than 30 days ago, the defendant has satisfied the exhaustion requirement.

> (i) The defendant is—
>
>> (I) suffering from a serious physical or medical condition,
>>
>> (II) suffering from a serious functional or cognitive impairment, or
>>
>> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13 application note 1(A)(ii).

### B. *Defendant's Health Condition*

As set out earlier, application note 1(A)(ii)(I) to U.S.S.G. § 1B1.13 defines "extraordinary and compelling reasons" under § 3582(c)(1)(A) to include "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." During the COVID-19 pandemic, the government views this application note to encompass chronic medical conditions that substantially diminish a defendant's ability to provide self-care against serious injury or death as a result of COVID-19 within the environment of a correctional facility, because of the chronic condition itself.

Under CDC guidelines, an individual with a body mass index ("BMI") of 30 or over faces an increased risk of serious illness from COVID-19.[2] Per paragraph 62 of the PSI, the defendant is 5' 6". Per BOP records, the defendant weighed 209 lbs. on April 11, 2020, and 200 lbs. on

---

[2] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#obesity.

October 30, 2020. The defendant's health problems list relates that he has a BMI of between 33.0 and 33.9. At the defendant's height and weight, that measurement roughly corresponds with BMI measurements based upon height and weight from a government table.[3] Accordingly, the government accepts that there is sufficient basis to conclude that defendant suffers from obesity sufficient to qualify under as an "extraordinary and compelling reason" under U.S.S.G. § 1B1.13 application note 1(A)(ii)(I) and 18 U.S.C. § 3582(c)(1)(A).

      C.     *The Defendant Has Not Met His Burden of Showing That: (i) The Balance of § 3553(a) Factors Weigh in Favor of Reducing His Sentence and (ii) That He Is Not a Danger to the Safety of Any Other Person or to the Community*

Although the defendant's health condition is extraordinary and compelling, that consideration addresses only one portion of the Court's inquiry and does not direct granting compassionate release. *See United States v. Rodriguez-Orejuela*, 2020 WL 2050434, *7 (S.D. Fla. April 28, 2020). Rather, the Court also must consider the applicable § 3553(a) factors, as well as whether the defendant is a danger to the community.

The defendant bears the burden of establishing that compassionate release is warranted. *See United States v. Anders*, 2020 WL 3129120, *3 (S.D. Fla. June 12, 2020) (citing *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013)). This includes bearing the burden of establishing that the § 3553(a) factors weigh in favor of the defendant's release and that the defendant is not a danger to the community. *See United States v. Brinkley*, 2020 WL 3051574, *2 (S.D. Fla. June 7, 2020) (Scola, J.) ("Crucially, Brinkley did not demonstrate that he would not pose a danger to the community and that the 3553 factors weigh in favor of his release"), *appeal dism'd*, 2020 WL 5647740 (11th Cir. July 15, 2020); *United States v. Zamor*, 460 F. Supp.3d 1314, 1317 (S.D. Fla.

---

[3] *See* https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmi_tbl2.htm.

2020) (Scola, J.) ("Zamor did not demonstrate that he would not pose a danger to the community and that the 3553 factors weigh in favor of his release").

For the reasons set forth below, the defendant has not met his burden as to either consideration. Indeed, to the contrary, the § 3553(a) factors weigh decidedly against release, and the defendant continues to presents a significant danger to others.

      i.      **The Factors Under 18 U.S.C. § 3553(a) Weigh Decidedly Against Release**

At the time the Court sentenced the defendant, the defendant was 39 years old. Per the joint recommendation in the plea agreement, the Court sentenced the defendant to a term of imprisonment of 360 months, which was at the bottom of the applicable sentencing guideline range. *See* PSI ¶ 74. In so doing, the Court determined that the gravity of the defendant's criminal conduct directed a sentence that would result in the defendant's incarceration past his 60th birthday.

In terms of setting out the utter egregiousness of the defendant's criminal conduct, the summary of the defendant's offense conduct set out in Section 1.C. of this response essentially speaks for itself. In so doing, the offense conduct summary demonstrates that the defendant's continued imprisonment is consistent with key § 3553(a) objectives such as: (a) reflecting the seriousness of the defendant's criminal conduct, (b) promoting respect for the law, (c) providing just punishment for the offense, (c) affording adequate deterrence to criminal conduct, and (e) protecting the public from further crimes of the defendant. *See* 18 U.S.C. § 3553(a)(2)(A)-(C).

The defendant's life history presents scant evidence that he has rehabilitated or any likelihood that he will conduct himself lawfully if the Court were to grant his motion. From his early 20s to until his arrest when he was 36 years' old, the defendant engaged in ongoing criminal activity as one of the leaders of an extraordinary prolific and violent criminal organization.

Additionally, the summary of the defendant's misconduct while in custody following his extradition casts significant doubt on the notion that he has changed his ways.

Denial of the defendant's motion also advances the goal under 18 U.S.C. § 3553(a)(6) of "avoid[ing] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Three defendants in this case were convicted of offenses associated with the Garcia Giraldo murder – this defendant; Diego Montoya Sanchez, who also pled guilty to Counts 1 and 10, *see* DEs 244, 333, 335, 335-2, & 353; and Oscar Varela Garcia, who was convicted after trial of Counts 1-3 and 9-12, *see* DEs 277, 625, & 677.[4]

Varela Garcia was the last of these three defendants to come before the Court for sentencing. On April 28, 2009, the Court sentenced this defendant, who was the third-in-command of the organization, to a term of imprisonment of 30 years, or 360 months. *See* DEs 319 & 320. On October 21, 2009, the Court sentenced Diego Montoya Sanchez, who was the leader of the organization, to a term of imprisonment of 45 years, or 540 months. *See* DEs 352 & 353. Lastly, on October 20, 2011, the Court sentenced Varela Garcia, who oversaw enforcers and hitmen in the organization and reported to Diego Montoya Sanchez and this defendant, to a term of imprisonment of 23 years and 4 months, or 280 months. *See* DEs 676 & 677.

In declining to follow the government's request to sentence Varela Garcia to a term within a range of 546-673 months and instead imposing a substantially shorter sentence, *see* DE 696, p. 34 & 49-50, the Court placed significant weight on Varela Garcia's position in the organization's hierarchy when measured against this defendant and his brother, Diego. "I simply cannot, in good

---

[4] This defendant and Diego Montoya Sanchez both were arraigned on the fifth superseding indictment, while Varela Garcia was arraigned on the sixth superseding indictment. *See* DEs 268 (text on docket sheet), 309, & 430.

conscience, sentence this defendant to a term longer than the terms that Eugenio and Diego Montoya Sanchez were given." *Id*. at 49.

> [I]n terms of this defendant's relevant conduct, a number of other murders, and all of those murders occurred because this defendant was a member of an organization that had leaders, and I looked at the codefendant who operated in the role of enforcers similar to Mr. Varela Garcia, and [counsel for Varela Garcia] has already alluded to the sentence that Mr. Robayo Escobar received and the sentence I looked at as well of Giraldo Rodriguez Herrera.

*Id.* at 50.

Granting the defendant's motion would upset the balance the Court set through its sentence of Varela Garcia – particularly insofar as it would result in Varela Garcia facing a longer sentence than what this defendant would serve. The Court also should reject the defendant's suggestion at pages 14-17 of his motion that sentences received by other defendant in the case not addressed in the previous two paragraphs should bear on his motion. None of these other defendants were convicted of murder, and all were subordinate in the Montoya organization to this defendant.

The defendant discusses his health situation at pages 2 & 10-12 of his motion and his incarcerative history at pages 3-4 & 12 of the motion. Neither consideration alters the balance that causes the § 3553(a) factors to tilt decidedly against the defendant's motion.

The defendant's health problems list, which is appended as **<u>Attachment 1</u>** to the government's sealed supplement, does not show any extraordinary medical issues. As noted in Section 1.E. of this response, BOP believes that it can address the defendant's medical needs, and the defendant does not present anything to upset that conclusion. Thus, to the extent the defendant may have contracted COVID-19 during in the early stages of the pandemic, his health problems list does not reflect any medical consequences that BOP cannot manage. Although the defendant's motion discusses issues at Oakdale I FCI in its response to COVID-19 in the early stages of the pandemic, the motion does not demonstrate any current issues.

Regarding the defendant's hypertension history, the CDC guidelines set out at page 15, footnote 2, of this response list hypertension as a condition that "might" place an adult at risk for severe illness from COVID-19, as opposed to one actually known to do so.  Although five of the defendant's last six blood pressure checks were above the recommended range of 120/80, the records appended as **Attachment 2** to the government's sealed supplement reflect that one of the measurements was within range, thus suggesting that his condition is treatable.

To the extent defendant accurately depicts the conditions of his confinement during the period from summer 2017, when he was at Beaumont FCI, any such issues would be common to all inmates in these institutions.  They are not the type of issues meant to be addressed under the compassionate release statute, which focuses on the presence of extraordinary medical conditions particular and unique to individual inmates.  Nor should any issues associated with the granting of visas to family members be matters addressed through the compassionate release statute.

Lastly, at pages 2 and 13 of his motion, the defendant suggests that the government's failure to seek a Rule 35 sentencing reduction should result in the Court adjusting his sentence through the compassionate release statute.  The government disagrees that such considerations should be relevant.  In any event, as will be explained in government's sealed supplement, the defendant's plight in this regard results from the shortcomings in both his cooperation and his conduct while in custody.  Those shortcomings should not prompt entitlement of leniency through the instant motion.

### ii.     The Defendant is a Danger to the Community and Others

As noted in Section III.A. of this response, U.S.S.G. § 1B1.13 advises that courts reduce a defendant's sentence under § 3582(c)(1)(A) only if "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  The record before this Court reflects that the defendant continues to pose a risk of danger to others.  The bases for

this conclusion include the nature and duration of the defendant's criminal conduct, the lack of evidence of rehabilitation, the indications from the defendant's prison misconduct that reflect lack of rehabilitation, and the lack of any significant adult history of law abiding conduct.

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's motion.

                                      Respectfully submitted,

                                      ARIANA FAJARDO ORSHAN
                                      UNITED STATES ATTORNEY

By:    /s/ Michael S. Davis
        MICHAEL S. DAVIS
        ASSISTANT U.S. ATTORNEY
        FL BAR # 972274
        99 N.E. 4th Street
        Miami, Florida 33132
        (305) 961-9027 (phone); (305) 536-4675 (fax)
        E-mail: Michael.Davis2@usdoj.gov